**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| THE PROTECT DEMOCRACY PROJECT, INC., <br><br> Plaintiff, <br><br> v. <br><br> U.S. DEPARTMENT OF JUSTICE, U.S. DEPARTMENT OF DEFENSE, U.S. DEPARTMENT OF STATE, <br><br> Defendants. | Civil Action No. 20-172 |

**MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Anne H. Tindall
The Protect Democracy Project, Inc.
2020 Pennsylvania Ave., NW #163
Washington, DC 20006
T: (202) 579-4582 | F: (929) 777-8428
anne.tindall@protectdemocracy.org

Benjamin L. Berwick
The Protect Democracy Project, Inc.
15 Main St., Suite 312
Watertown, MA 02472
T: (202) 579-4582 | F: (929) 777-8428
ben.berwick@protectdemocracy.org

John Paredes*
The Protect Democracy Project, Inc.
115 Broadway, 5th Floor
New York, NY 10006
T: (202) 579-4582 | F: (929) 777-8428
john.paredes@protectdemocracy.org

*Counsel for Plaintiff*

*Motion for admission *pro hac vice* pending.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 4

    I.    The Military Strike on Iran and the Administration's Shifting Justifications ................... 4

    II.   Risk of Escalation and Congressional Action.................................................... 9

    III.  Plaintiff's FOIA Requests and this Litigation ................................................ 12

ARGUMENT ..................................................................................................................... 14

    I.    Plaintiff Is Likely to Succeed on the Merits ..................................................... 14

    II.   Plaintiff Will Be Irreparably Harmed Absent the Requested Relief................................ 16

    III.  The Requested Relief Will Not Burden Others' Interests ................................. 19

    IV.  The Public Interest Favors the Requested Relief............................................ 20

CONCLUSION.................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Fayed v. CIA,*
254 F.3d 300 (D.C. Cir. 2001) .............................................. 14

\* *Am. Oversight v. U.S. Dep't of State,*
414 F. Supp. 3d 182 (D.D.C. 2019) ................................... *passim*

*Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n,*
711 F.3d 180 (D.C. Cir. 2013) .............................................. 15

*Ctr. for Pub. Integrity v. United States Dep't of Def.,*
411 F. Supp. 3d 5 (D.D.C. 2019) .......................................... 19

*Elec. Frontier Found. v. Office of Dir. Nat'l Intelligence,*
No. C 07-5278 SI, 2007 WL 4208311 (N.D. Cal. Nov. 27, 2007) ......... 19

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Justice,*
416 F. Supp. 2d 30 (D.D.C. 2006) ................................... 16, 20

*Fiduccia v. U.S. Dep't of Justice,*
185 F.3d 1035 (9th Cir. 1999) .............................................. 19

*Jacksonville Port Auth. v. Adams,*
556 F.2d 52 (D.C. Cir. 1977) ......................................... 19, 20

*Nat'l Archives & Records Admin. v. Favish,*
541 U.S. 157 (2004) ......................................................... 16

*Payne Enters. v. United States,*
837 F.2d 486 (D.C. Cir. 1988) .............................................. 16

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press,*
489 U.S. 749 (1989) ......................................................... 20

**Statutes**

5 U.S.C. § 552(a)(6)(A) ..................................................... 13

5 U.S.C. § 552(a)(6)(B) ................................................. 13, 15

5 U.S.C. § 552(a)(6)(E) ............................................. 12, 14, 15

**Page(s)**

**Statutes (cont.)**

50 U.S.C. § 1542 ................................................................................................................ 5

**Other Authorities**

Aaron Blake, *Trump's no-injuries claim about Iran keeps looking worse*,
    Wash. Post (Feb. 10, 2020), https://www.washingtonpost.com/politics/2020/02/10/trump-
    bungled-his-iran-victory-speech/ ............................................................................ 9

Abraham Lincoln to William H. Herndon, 15 Feb. 1848,
    *Collected Works of Abraham Lincoln*, vol. 1,
    http://quod.lib.umich.edu/l/lincoln/lincoln1/1:458.1?rgn=div2;view=fulltext
    (accessed Jan. 21, 2020) ....................................................................................... 18

Amber Phillips, *What is the War Powers Act and what can
    Congress do to enforce it with Trump on Iran?*, Wash. Post (Jan. 8, 2020),
    https://www.washingtonpost.com/politics/2020/01/07/war-powers-act-explained/ ............... 6

Authority To Use Military Force in Libya, 35 Op. O.L.C. (2011) ...................................... 9

Brain Injury Assoc. of Am., *BIAA Responds to Trump's Statement
    About Service Members with Traumatic Brain Injury* (Jan. 22, 2020),
    https://www.biausa.org/public-affairs/public-awareness/news/biaa-responds-to-trumps-
    disregard-for-service-members-with-traumatic-brain-injury ...................................... 9

Carol E. Lee & Courtney Kube, *Trump authorized Soleimani's
    killing 7 months ago, with conditions*, NBC News (Jan. 13, 2020),
    https://www.nbcnews.com/politics/national-security/trump-authorized-soleimani-s-killing-7-
    months-ago-conditions-n1113271 ........................................................................... 7

Catie Edmondson & Charlie Savage, *House Votes to Restrain
    Iran War Powers*, N.Y. Times (Jan. 9, 2020),
    https://www.nytimes.com/2020/01/09/us/politics/trump-iran-war-powers.html ...................... 11

Catie Edmondson, *In Bipartisan Bid to Restrain Trump,
    Senate Passes Iran War Powers Resolution*, N.Y. Times (Feb. 13, 2020),
    https://www.nytimes.com/2020/02/13/us/politics/iran-war-powers-trump.html ............... 11, 17

Catie Edmondson, *Mike Lee, a G.O.P. Senator, Calls
    Administration's Iran Briefing 'Insulting'*, N.Y. Times (Jan. 8, 2020),
    https://www.nytimes.com/2020/01/08/us/politics/senator-mike-lee-iran-briefing.html ............ 7

**Page(s)**

**Other Authorities (cont.)**

Christopher S. Murphy (@ChrisMurphyCT), Twitter (Jan. 2, 2020, 5:49 PM),
 https://twitter.com/ChrisMurphyCT/status/1212913952436445185 .................................... 4, 20

Donald J. Trump (@realDonaldTrump), Twitter (Jan. 4, 2020, 2:52 PM),
 https://twitter.com/realDonaldTrump/status/1213593965838163968 ....................................... 5

Donald J. Trump, Twitter (Jan. 13, 2020, 11:09 AM),
 https://twitter.com/realDonaldTrump/status/1216754098382524422 ....................................... 8

Donald J. Trump, Twitter (Jan. 5, 2020, 3:25 PM),
 https://twitter.com/realDonaldTrump/status/1213919480574812160 ....................................... 6

Donald J. Trump, Twitter (Jul. 22, 2018, 11:24 PM),
 https://twitter.com/realDonaldTrump/status/1021234525626609666 ....................................... 10

Donald J. Trump, Twitter (Jul. 3, 2019, 4:33 PM),
 https://twitter.com/realDonaldTrump/status/1146517318509481984 ....................................... 10

Donald J. Trump, Twitter (Jun. 25, 2019, 10:42 AM),
 https://twitter.com/realDonaldTrump/status/1143529907403788288 ....................................... 10

Ed Kilgore, *What Legal Authority Did Trump Have to Assassinate Qasem Soleimani?*,
 N.Y. Mag. (Jan. 3, 2020), http://nymag.com/intelligencer/2020/01/what-is-trumps-legal-
 authority-for-soleimani-assassination.html .............................................................................. 17

Eliot L. Engel, Statement on the White House's Latest
 Justification for Soleimani Killing (Feb. 14, 2020), https://foreignaffairs.house.gov/press-
 releases?ID=CB9812EA-2FE2-4643-9DEF-178FDFAD9A95 ............................................... 8

Elliot Setzer, *White House Releases Report Justifying Soleimani Strike*,
 Lawfare (Feb. 14, 2020), https://www.lawfareblog.com/white-house-releases-report-
 justifying-soleimani-strike ...................................................................................................... 17

Jake Tapper, Ryan Browne, and Barbara Starr, *US troops were
 injured in Iran missile attack despite Pentagon saying initially there
 were no casualties*, CNN (Jan. 17, 2020), https://www.cnn.com/2020/01/16/politics/service-
 members-injured-iran-strike/index.html ............................................................................. 9, 10

Karen DeYoung, *Trump says 'it doesn't really matter' if Iranian general
 posed an imminent threat*, Wash. Post (Jan. 13, 2020),
 https://www.washingtonpost.com/national-security/trump-says-it-doesnt-really-matter-if-
 iranian-general-posed-an-imminent-threat/2020/01/13/c9f7ea1c-362e-11ea-9541-
 9107303481a4_story.html ........................................................................................................ 8

**Page(s)**

**Other Authorities (cont.)**

Katie Rogers, *Trump Says 4 Embassies Had Been Targeted by Iranians*,
    N.Y. Times (Jan. 10, 2020), https://www.nytimes.com/2020/01/10/world/middleeast/trump-iran-embassy-attacks.html ........................................................................... 7

Ken Dilanian, *Was it legal for Donald Trump to order the killing of a*
    *top Iranian general?*, NBC News (Jan. 3, 2020), https://www.nbcnews.com/news/world/was-it-legal-donald-trump-order-killing-top-iranian-general-n1109961 ......................................... 17

Libbey Cathey, *Pelosi demands briefing on US-Iran strike,*
    *Graham says he was informed beforehand*, ABC News (Jan. 3, 2020),
    https://abcnews.go.com/Politics/pelosi-demands-briefing-us-iran-strike-graham-trump/story?id=68049245 ........................................................................................ 5

Lisa Mascaro & Deb Riechmann, *Trump tests Congress'*
    *war powers with strike against Iran*, AP (Jan. 7, 2020),
    https://apnews.com/9a76c82948930cdcd2e6531b3030670d ................................................... 17

Maggie Haberman and Catie Edmondson, *White House Notifies*
    *Congress of Suleimani Strike Under War Powers Act*, N.Y. Times (Jan. 4, 2020),
    https://www.nytimes.com/2020/01/04/us/politics/white-house-war-powers-resolution.html .... 6

Merrit Kennedy & Jackie Northam, *Was it Legal For the U.S. To*
    *Kill a Top Iranian Military Leader?*, NPR (Jan. 4, 2020),
    https://www.npr.org/2020/01/04/793412105/was-it-legal-for-the-u-s-to-kill-a-top-iranian-military-leader ........................................................................................ 17

Michael Crowley, *et al.*, *U.S. Strike in Iraq Kills Qassim Suleimani,*
    *Commander of Iranian Forces*, N.Y. Times (last updated Jan. 7, 2020),
    https://www.nytimes.com/2020/01/02/world/middleeast/qassem-soleimani-iraq-iran-attack.html ........................................................................................ 4

Notice on the Legal and Policy Frameworks Guiding the United States'
    Use of Military Force and Related National Security Operations (Feb. 14, 2020),
    https://foreignaffairs.house.gov/_cache/files/4/3/4362ca46-3a7d-43e8-a3ec-be0245705722/6E1A0F30F9204E380A7AD0C84EC572EC.doc148.pdf ................................ 8

Peter Baker & Thomas Gibbons-Neff, *Esper Says He Saw No Evidence Iran Targeted*
    *4 Embassies, as Story Shifts Again*, N.Y. Times (Jan. 12, 2020),
    https://www.nytimes.com/2020/01/12/us/politics/esper-iran-trump-embassies.html ............... 7

Peter Baker, *et al.*, *Seven Days in January: How Trump Pushed*
    *U.S. and Iran to the Brink of War*, N.Y. Times (last updated Jan. 13, 2020),
    https://www.nytimes.com/2020/01/11/us/politics/iran-trump.html ............................................ 6

**Page(s)**

**Other Authorities (cont.)**

Robin Wright, *The Killing of Qassem Suleimani is
    Tantamount to an Act of War*, The New Yorker (Jan. 3, 2020),
    https://www.newyorker.com/news/our-columnists/the-us-assassinated-suleimani-the-chief-
    exporter-of-irans-revolution-but-at-what-price.......................................................................... 11

Scott R. Anderson, *Did the President Have the Domestic
    Legal Authority to Kill Qassem Soleimami*, Lawfare (Jan. 3, 2020),
    https://www.lawfareblog.com/did-president-have-domestic-legal-authority-kill-qassem-
    soleimani ................................................................................................................................... 17

Sean Illing, *An expert on why the Soleimani assassination
    was almost certainly illegal*, Vox (Jan. 3, 2020),
    https://www.vox.com/2020/1/3/21048012/iran-general-killed-qasem-soleimani-legality ....... 17

Steven Erlanger, *France, Germany and U.K. Serve Notice on
    Iran Under Nuclear Deal*, N.Y. Times (Jan. 14, 2020),
    https://www.nytimes.com/2020/01/14/world/europe/iran-nuclear-deal.html.......................... 10

Tim Arango, *et al.*, *Qassim Suleimani, Master of Iran's Intrigue,
    Built a Shiite Axis of Power in the Mideast*, N.Y. Times (last updated Jan. 13, 2020),
    https://www.nytimes.com/2020/01/03/obituaries/qassem-soleimani-dead.html ...................... 4

Tim Lister & Eve Bower, *Growing doubts on legality of US strike that
    killed Iranian general*, CNN (last updated Jan. 6, 2020),
    https://www.cnn.com/2020/01/06/middleeast/soleimani-strike-legality-doubts-us-iran-
    intl/index.html ........................................................................................................................... 17

U.N. Charter art. 2, para. 4 ............................................................................................................ 5

U.N. Charter, art. 51 ....................................................................................................................... 5

William Roberts, *Was Trump's order to assassinate Iran's
    Qassem Soleimani legal?*, Al Jazeera U.S. (Jan. 3, 2020),
    https://www.aljazeera.com/news/2020/01/trump-order-assassinate-iran-qassem-soleimani-
    legal-200103212119366.html ................................................................................................... 17

## INTRODUCTION

On January 2, 2020, President Trump ordered the targeted killing of Iran's top military commander, reportedly the second most powerful man in Iran, Major General Qassim Soleimani—without approval from Congress or the U.N. Security Council.  Breaking precedent with recent administrations, the White House sent Congress the notice of this strike that is required by the War Powers Resolution by way of an entirely classified document.  Thus, the American people know nothing and can know nothing of its contents, and Congress cannot engage in public debate on the soundness of the White House rationale for the attack.

The next day, The Protect Democracy Project, Inc. ("Protect Democracy") submitted substantially identical FOIA requests to the Department of Defense ("DOD"), the Department of State ("State"), and three offices of the Department of Justice ("DOJ"): the Office of Legal Counsel ("OLC"), the Office of Information Policy ("OIP"), and the National Security Division ("NSD").  The requests seek records relating to the military strike, the President's rationale and legal justification—if any—for the strike, and any related communications with Congress or consideration of whether or not to inform Congress of the strike.

Recognizing the grave implications of killing the top general of a regional military power without congressional or United Nations approval, the risk of rapid escalation in hostilities, and the volatility of war, Protect Democracy requested expedited treatment.  Although DOJ's components OLC and OIP appropriately granted expedition, initially, DOJ's NSD, as well as DOD and State, erroneously denied it.  These agencies reversed their denials in response to an earlier preliminary injunction motion filed by Protect Democracy in this action.[1]  In spite of

---

[1] Protect Democracy withdrew its prior motion in response to the Defendant agencies' belated grants of expedition.

having ultimately granted expedited processing, and thus, recognizing the urgency of Protect Democracy's requests, Defendants failed to comply with FOIA's deadline for responding.

Meanwhile, Defendants have offered vague and inconsistent legal and policy justifications for the killing, and barely anything in writing. Initially, Trump administration officials claimed that Soleimani was plotting some imminent attack on the United States, which would justify the killing as self-defense under domestic and international law. But after it was revealed that President Trump had approved the strike seven months in advance, the President pivoted and asserted that "it doesn't really matter" whether the targeted killing was in response to an imminent threat to the United States, effectively disavowing the need for any justification under U.S. or international law to unilaterally engage in acts of war. Later, the administration pivoted again and asserted in a two-page written notice required by the 2018 National Defense Authorization Act ("NDAA") that the strike was covered by the 2002 Authorization for Use of Military Force against Iraq (the "Iraq AUMF").

Looming over this discourse is the very real risk of escalation. Following Soleimani's killing, the Iranian government has launched missile strikes on two Iraqi military bases housing U.S. troops resulting in over 100 injured U.S. troops, shot down a Ukrainian commercial airliner—claiming error—killing all 176 aboard, and repudiated previously agreed-to restrictions on uranium enrichment.

In the wake of these events, the House quickly passed a resolution pursuant to the War Powers Resolution curtailing President Trump's authority to wage war on Iran. The Senate then passed its own similar legislation, which, House Speaker Nancy Pelosi has announced, the House will take up shortly. Without access to the President's full and actual legal and policy justification for the attack, the public lacks the information necessary to express its views on this

congressional deliberation of the highest consequence and urgency.  The House is next in session on February 25—less than a week from the date of this filing—and could vote on the Senate resolution as soon as that date, foreclosing the opportunity for further public input on Congress's critical first action in response to the Soleimani attack.

Protect Democracy seeks to compel all Defendants to make the statutorily required determinations and notifications, and produce:

- Within 24 hours of the issuance of this Court's Order, non-exempt portions of (1) any OLC memoranda addressing the legality of the Soleimani strike and/or any obligation to consult with Congress regarding that strike; (2) any correspondence or memoranda addressing the legality of the strike drafted by officials serving any one of the Defendants and shared with the National Security Council; and (3) any "record of discussions" or "summary of conclusions" related to a meeting or meeting(s) involving lawyers for any of the Defendants and pertaining to the Soleimani strike; or confirmation that no such records exist; and

- By March 18, 2020, or by another date certain to be determined by the Court, all non-exempt requested records (or acknowledgement if no such records exist).

Truly expedited production is crucial.  Congress is debating the appropriate response to the Defendants' actions against Iran *right now*, and the American people must be able to weigh in.  Only expedition will prevent the irreparable harm that would result should armed conflict escalate further and the United States lose lives and treasure in another war while the American people and their elected representatives are denied the information they need to participate in democratic debate.

## BACKGROUND

### I.      The Military Strike on Iran and the Administration's Shifting Justifications

On January 2, 2020, President Trump approved the targeted killing of Iran's top general

at Baghdad International Airport in Iraq.[2]  Acting on the President's orders, an American MQ-9

Reaper drone fired missiles into a convoy leaving the airport, killing Major General Qassim

Soleimani, who was the leader of the elite Quds Force of the Islamic Revolutionary Guard Corps

of Iran and Iran's most important military commander.[3]  Soleimani was behind almost every

significant Iranian intelligence and military operation over the past twenty years,[4] and is

responsible for hundreds of American deaths in Iraq, and numerous militia attacks on Israel.[5]

"Soleimani was an enemy of the United States. That's not a question," Senator

Christopher S. Murphy wrote on Twitter.[6]  Nevertheless, he added, "[t]he question is this—as

reports suggest, did America just assassinate, without any congressional authorization, the

second most powerful person in Iran, knowingly setting off a potential massive regional war?"[7]

Two days later, in response to Iranian government pledges to reciprocate, President

Trump warned that a strike on Americans or American assets would mean that "52 Iranian sites

(representing the 52 American hostages taken by Iran many years ago), some at a very high level

---

[2] Michael Crowley, *et al.*, *U.S. Strike in Iraq Kills Qassim Suleimani, Commander of Iranian Forces*, N.Y. Times (last updated Jan. 7, 2020),
https://www.nytimes.com/2020/01/02/world/middleeast/qassem-soleimani-iraq-iran-attack.html.
[3] *Id.*
[4] *Id.*
[5] Tim Arango, *et al.*, *Qassim Suleimani, Master of Iran's Intrigue, Built a Shiite Axis of Power in the Mideast*, N.Y. Times (last updated Jan. 13, 2020),
https://www.nytimes.com/2020/01/03/obituaries/qassem-soleimani-dead.html.
[6] Christopher S. Murphy (@ChrisMurphyCT), Twitter (Jan. 2, 2020, 5:49 PM),
https://twitter.com/ChrisMurphyCT/status/1212913952436445185.
[7] *Id.*

& important to Iran & the Iranian culture, and those targets, and Iran itself, WILL BE HIT VERY FAST AND VERY HARD."[8]

There is no readily apparent international or domestic authorization for the use of force against Iran.  As to requirements imposed by international law, the United Nations Charter, a treaty ratified by the United States, permits the use of force against another country only with permission of the United Nations Security Council or as a matter of self-defense.[9]  There is no such resolution providing legal authority for military action against the Iranian government.

And as Senator Murphy noted, the U.S. Congress has not authorized the use of force against the Iranian government.  Section 3 of the War Powers Resolution requires that "[t]he President in every possible instance shall consult with Congress before introducing United States Armed Forces into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances."  50 U.S.C. § 1542.  Longstanding U.S. government protocol has implemented this requirement via Executive Branch consultation with the "Gang of Eight" in Congress, consisting of leadership of both parties and of the intelligence committees in both chambers.  The White House did not inform congressional leaders of plans for the Soleimani strike—or the intelligence that the White House claimed justified it—before the attack.  The only member of Congress who appears to have been briefed on plans for the strike is Senator Lindsey Graham who stated he learned of those plans while golfing with President Trump at Trump's resort in Florida.[10]

---

[8] Donald J. Trump (@realDonaldTrump), Twitter (Jan. 4, 2020, 2:52 PM), https://twitter.com/realDonaldTrump/status/1213593965838163968.

[9] U.N. Charter art. 2, para. 4; art. 51.

[10] Libbey Cathey, *Pelosi demands briefing on US-Iran strike, Graham says he was informed beforehand*, ABC News (Jan. 3, 2020), https://abcnews.go.com/Politics/pelosi-demands-briefing-us-iran-strike-graham-trump/story?id=68049245.

On January 4, 2020, 48 hours after the strike on General Soleimani, the White House sent Congress a notification regarding the strike as required by the War Powers Resolution.  The White House included only classified information in the notification, so the American people know nothing and can know nothing of its contents, and Congress cannot engage in public debate on the soundness of the rationale for the attack described in this notice.[11]  House Speaker Nancy Pelosi has criticized the secret contents of the notification as "prompt[ing] serious and urgent questions about the timing, manner and justification of the Administration's decision to engage in hostilities against Iran."[12]

The next day, President Trump posted as follows on Twitter:

> These Media Posts will serve as notification to the United States Congress that should Iran strike any U.S. person or target, the United States will quickly & fully strike back, & perhaps in a disproportionate manner. Such legal notice is not required, but is given nevertheless![13]

On January 8, 2020, administration officials briefed members of Congress regarding the White House's justification for the targeted killing.  The officials asserted generally that intelligence showed that Soleimani posed an imminent threat but refused to describe it in detail.[14]  "What really came across was a sense of disdain and contempt for the legislative branch," said Representative Gerald E. Connolly.  "They didn't even pretend to be engaged in information

---

[11] Maggie Haberman and Catie Edmondson, *White House Notifies Congress of Suleimani Strike Under War Powers Act*, N.Y. Times (Jan. 4, 2020), https://www.nytimes.com/2020/01/04/us/politics/white-house-war-powers-resolution.html.
[12] *Id.*
[13] Donald J. Trump, Twitter (Jan. 5, 2020, 3:25 PM), https://twitter.com/realDonaldTrump/status/1213919480574812160; Amber Phillips, *What is the War Powers Act and what can Congress do to enforce it with Trump on Iran?*, Wash. Post (Jan. 8, 2020), https://www.washingtonpost.com/politics/2020/01/07/war-powers-act-explained/.
[14] Peter Baker, *et al.*, *Seven Days in January: How Trump Pushed U.S. and Iran to the Brink of War*, N.Y. Times (last updated Jan. 13, 2020), https://www.nytimes.com/2020/01/11/us/politics/iran-trump.html.

sharing and consultation."[15]  Senator Mike Lee described the briefing for Senators as "probably the worst briefing I've ever seen, at least on a military issue, in the nine years I've served in the United States Senate."[16]

In the following days and weeks, the administration has provided conflicting rationales for the strike.  On Friday, January 10, 2020, President Trump told Fox News's Laura Ingraham in an interview broadcast that the purported imminent threat had been to four U.S. embassies across the Middle East.[17]  The following Sunday, Defense Secretary Mark T. Esper said on CBS's "Face the Nation" that he had never been shown evidence that Iran was planning an attack on four embassies.[18]  In that same program, Representative Adam B. Schiff, Chairman of the House Permanent Select Committee on Intelligence and thus a member of the Gang of Eight, said the briefing for the Gang of Eight after the attack never mentioned that four embassies were targeted.[19]  The next day, on January 13, 2020, at 4:49 a.m., NBC reported that President Trump had authorized Soleimani's killing back in June 2019, seven months in advance, provided that the President had final sign-off on any specific military operation.[20]  And at 8:09 a.m., President Trump tweeted that "it doesn't really matter" whether the targeted killing was in response to an

---

[15] *Id.*

[16] Catie Edmondson, *Mike Lee, a G.O.P. Senator, Calls Administration's Iran Briefing 'Insulting'*, N.Y. Times (Jan. 8, 2020), https://www.nytimes.com/2020/01/08/us/politics/senator-mike-lee-iran-briefing.html.

[17] Katie Rogers, *Trump Says 4 Embassies Had Been Targeted by Iranians*, N.Y. Times (Jan. 10, 2020), https://www.nytimes.com/2020/01/10/world/middleeast/trump-iran-embassy-attacks.html.

[18] Peter Baker & Thomas Gibbons-Neff, *Esper Says He Saw No Evidence Iran Targeted 4 Embassies, as Story Shifts Again*, N.Y. Times (Jan. 12, 2020), https://www.nytimes.com/2020/01/12/us/politics/esper-iran-trump-embassies.html.

[19] *Id.*

[20] Carol E. Lee & Courtney Kube, *Trump authorized Soleimani's killing 7 months ago, with conditions*, NBC News (Jan. 13, 2020), https://www.nbcnews.com/politics/national-security/trump-authorized-soleimani-s-killing-7-months-ago-conditions-n1113271.

imminent threat to the United States, effectively disavowing the need for a justification under U.S. or international law unilaterally to engage in acts of war.[21]

On February 14, the day after a bipartisan vote in the Senate to prohibit further military action against Iran, *see infra* at 11, the administration pivoted yet again.  It asserted in a two-page written notice required by the 2018 NDAA that the strike was covered by the 2002 Authorization for Use of Military Force against Iraq.[22]  Representative Eliot L. Engel, Chairman of the House Committee on Foreign Affairs, responded in a statement: "This legal theory is absurd.  The 2002 authorization was passed to deal with Saddam Hussein.  This law had nothing to do with Iran or Iranian government officials in Iraq."[23]

While the Trump administration's policy justifications for the strike have been inconsistent, the February 14 notice is the sole written legal justification for the targeted killing of a top Iranian government official that has been released to the American people.  The War Powers Resolution notification provided to Congress might have included a legal rationale, but if so, as explained above, the public cannot know because that notification was entirely classified.  This secrecy stands in contrast to the Department of Justice's actions in 2011 when the United

---

[21] Donald J. Trump, Twitter (Jan. 13, 2020, 11:09 AM), https://twitter.com/realDonaldTrump/status/1216754098382524422; Karen DeYoung, *Trump says 'it doesn't really matter' if Iranian general posed an imminent threat*, Wash. Post (Jan. 13, 2020), https://www.washingtonpost.com/national-security/trump-says-it-doesnt-really-matter-if-iranian-general-posed-an-imminent-threat/2020/01/13/c9f7ea1c-362e-11ea-9541-9107303481a4_story.html.
[22] Notice on the Legal and Policy Frameworks Guiding the United States' Use of Military Force and Related National Security Operations (Feb. 14, 2020), https://foreignaffairs.house.gov/_cache/files/4/3/4362ca46-3a7d-43e8-a3ec-be0245705722/6E1A0F30F9204E380A7AD0C84EC572EC.doc148.pdf.
[23] Eliot L. Engel, Statement on the White House's Latest Justification for Soleimani Killing (Feb. 14, 2020), https://foreignaffairs.house.gov/press-releases?ID=CB9812EA-2FE2-4643-9DEF-178FDFAD9A95.

States initiated the use of force against Libya.  Then, the Department of Justice's Office of Legal Counsel published a 14-page "Memorandum Opinion for the Attorney General," dated April 1, 2011, entitled "Authority To Use Military Force in Libya."[24]

## II.  Risk of Escalation and Congressional Action

In the meantime, the risk remains that the conflict will escalate.  On January 7, 2020, the Iranian government launched missile strikes against two Iraqi military bases housing U.S. troops in Iraq.  While the White House initially reported no casualties from the strikes, U.S. military reports identified at least 11 troops with traumatic brain injuries by January 17.[25]  The count rose to 34, then 50, then 64, then 109 on February 10.[26]  President Trump downplayed these injuries as "headaches, and a couple of other things," adding, "I don't consider them very serious . . . ."[27]  But, as explained in a statement released by the Brain Injury Association of America, "A brain injury changes the way you move, act, think, and feel—it has the potential to change who you are at your core.  What could be more serious than that?"[28]

President Trump has repeatedly threatened disproportionate retaliation in the event of a strike by Iran causing harm to U.S. interests.  Just months ago, he pledged that an "attack by Iran on anything American will be met with great and overwhelming force.  In some areas,

---

[24] *Available at* https://fas.org/irp/agency/doj/olc/libya.pdf.

[25] Jake Tapper, Ryan Browne, and Barbara Starr, *US troops were injured in Iran missile attack despite Pentagon saying initially there were no casualties*, CNN (Jan. 17, 2020), https://www.cnn.com/2020/01/16/politics/service-members-injured-iran-strike/index.html.

[26] Aaron Blake, *Trump's no-injuries claim about Iran keeps looking worse*, Wash. Post (Feb. 10, 2020), https://www.washingtonpost.com/politics/2020/02/10/trump-bungled-his-iran-victory-speech/.

[27] *Id.*

[28] Brain Injury Assoc. of Am., *BIAA Responds to Trump's Statement About Service Members with Traumatic Brain Injury* (Jan. 22, 2020), https://www.biausa.org/public-affairs/public-awareness/news/biaa-responds-to-trumps-disregard-for-service-members-with-traumatic-brain-injury.

overwhelming will mean obliteration."[29]  During tensions between the U.S. and Iran the year before, President Trump tweeted: "NEVER, EVER THREATEN THE UNITED STATES AGAIN OR YOU WILL SUFFER CONSEQUENCES THE LIKES OF WHICH FEW THROUGHOUT HISTORY HAVE EVER SUFFERED BEFORE. WE ARE NO LONGER A COUNTRY THAT WILL STAND FOR YOUR DEMENTED WORDS OF VIOLENCE & DEATH. BE CAUTIOUS!"[30]

Several hours after the attack on U.S. troops in Iraq, Iranian missile defenses shot down a Ukrainian commercial airliner that had just taken off from Tehran, killing all 176 aboard.  The Iranian government eventually admitted it was a "mistake," after initially denying responsibility.[31]

And on January 14, 2020, the governments of Great Britain, France, and Germany formally accused Iran of violating the 2015 agreement that limited its nuclear program.  The Iranian government linked its decision no longer to abide by those restrictions on its uranium enrichment to the U.S. strike on Soleimani.[32]  In response to recent similar threats from Iran to resume uranium enrichment, President Trump threatened that such action would "come back to bite [Iran] like no one has been bitten before!"[33]

---

[29] Donald J. Trump, Twitter (Jun. 25, 2019, 10:42 AM), https://twitter.com/realDonaldTrump/status/1143529907403788288.

[30] Donald J. Trump, Twitter (Jul. 22, 2018, 11:24 PM), https://twitter.com/realDonaldTrump/status/1021234525626609666.

[31] Tapper, Browne, and Starr, *supra* n. 25.

[32] Steven Erlanger, *France, Germany and U.K. Serve Notice on Iran Under Nuclear Deal*, N.Y. Times (Jan. 14, 2020), https://www.nytimes.com/2020/01/14/world/europe/iran-nuclear-deal.html.

[33] Donald J. Trump, Twitter (Jul. 3, 2019, 4:33 PM), https://twitter.com/realDonaldTrump/status/1146517318509481984.

The strike on Soleimani, Iran's response, and the President's consistent threats of escalation create the very real potential for future military action involving Iran.  Thus, the administration's foreign policy, military, and legal agencies have an obligation to provide to the American people straightforward and consistent legal and policy justifications for the targeted killing of Iran's top general, which military and foreign policy experts have described as "tantamount to an act of war."[34]

Our Constitution divides war-making powers between Congress and the President. Congress enacted the War Powers Resolution in 1973 to ensure that when the President acts militarily, it is with the participation of Congress.  Congress has taken steps to exercise its war powers to check the President with respect to Iran and the Soleimani strike.  On January 9, 2020, the House of Representatives passed a resolution pursuant to the War Powers Resolution that would require President Trump to seek congressional authorization before taking further military action against Iran.[35]  As mentioned above, the Senate passed a similar resolution on February 13, in a bipartisan 55-45 vote.[36]  Speaker Pelosi then announced that the House would take up the legislation "in the coming weeks."[37]  The House is next in session on February 25 and could vote on the Senate resolution as soon as that date—less than one week from the date of this filing.

---

[34] *E.g.*, Robin Wright, *The Killing of Qassem Suleimani is Tantamount to an Act of War*, The New Yorker (Jan. 3, 2020), https://www.newyorker.com/news/our-columnists/the-us-assassinated-suleimani-the-chief-exporter-of-irans-revolution-but-at-what-price.
[35] Catie Edmondson & Charlie Savage, *House Votes to Restrain Iran War Powers*, N.Y. Times (Jan. 9, 2020), https://www.nytimes.com/2020/01/09/us/politics/trump-iran-war-powers.html.
[36] Catie Edmondson, *In Bipartisan Bid to Restrain Trump, Senate Passes Iran War Powers Resolution*, N.Y. Times (Feb. 13, 2020), https://www.nytimes.com/2020/02/13/us/politics/iran-war-powers-trump.html.
[37] *Id.*

In order for Congress to exercise its role as a representative of the people, the people

must be able to provide their representatives with their views.  The public cannot do this in an

informed way on this pending legislation of vital national significance without access to

Defendant agencies' asserted legal authority and policy justification for the administration's

military actions against Iran.  Considering the demonstrated possibility of a sudden escalation of

hostilities with Iran, it is imperative that the public be informed of the administration's

assessments of its authority and its policy rationale for the Soleimani strike immediately.

### III.     Plaintiff's FOIA Requests and this Litigation

On January 3, 2020, Plaintiff sent FOIA requests to Defendant DOJ's components OLC,

OIP, and NSD, as well as to DOD and State.  Plaintiff's requests, which were identical but for

the name of the receiving agency, sought the following records:

1.  Any and all records, including but not limited to emails and memoranda, reflecting, discussing, or otherwise relating to the January 2, 2020 military strike in Iraq and/or the President's legal authority to launch such a strike.

2.  Any and all records, including but not limited to emails and memoranda, reflecting or related to communications with Congress, congressional committees, or individual members of Congress regarding the January 2, 2020 military strike in Iraq, including but not limited to records that reflect consideration of whether or not to inform Congress, congressional committees, or individual members of Congress of the strike, and/or the existence or absence of any obligation to inform Congress, congressional committees, or individual members of Congress of the strike.

The timeframe for this request was "December 1, 2019 through the present."  Ex. A (DOJ OLC

FOIA Request); Ex. B (OIP FOIA Request); Ex. C (NSD FOIA Request); Ex. D (DOD FOIA

Request); Ex. E (State FOIA Request).  For each of these FOIA requests, Plaintiff also sought

expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and the agency-specific regulations.

All Defendants, including the relevant DOJ components, acknowledged that they

received Protect Democracy's request on January 3.  Initially, only DOJ's OLC and OIP granted

Protect Democracy's expedition requests.  Ex. F (OLC Response); Ex. G (OIP Response).  NSD, DOD, and State erroneously denied them.  Ex. H (NSD First Response); Ex. J (DOD First Response); Ex. L (State First Response).  Protect Democracy then filed this action on January 22, 2020, and moved for a preliminary injunction to compel all Defendants to grant expedition.  *See* Dkts. 1, 3.  In response, NSD, DOD, and State reversed their initial decisions and granted Protect Democracy's request.  Ex. I (NSD Second Response); Ex. K (DOD Second Response); Ex. M (State Second Response).  Protect Democracy then withdrew its motion.  Dkt. 11.

Protect Democracy now moves again for a preliminary injunction because Defendants have failed to meet the statutory deadline for processing a FOIA request, as well as any extensions that may have been available to them.  Agencies ordinarily are required to respond to FOIA requests within 20 business days of receipt with a determination "whether to comply with the request"—*i.e.*, produce responsive documents—and to "immediately notify" the requestor of "such determination and the reasons therefor."  5 U.S.C. § 552(a)(6)(A)(i).  Under "unusual circumstances," an agency may avail of an extension of that deadline of no more than ten business days.  5 U.S.C. § 552(a)(6)(B).  Thirty-one business days have passed since all Defendants, including each of the relevant DOJ components, received Protect Democracy's FOIA requests, and no Defendant has made the required determination and notification.  Therefore, Protect Democracy now seeks an order requiring Defendants expeditiously to conduct an adequate search for records responsive to its requests, to make the required determination and notification, and to produce:

- Within 24 hours of the issuance of this Court's Order, non-exempt portions of (1) any OLC memoranda addressing the legality of the Soleimani strike and/or any obligation to consult with Congress regarding that strike; (2) any correspondence

or memoranda addressing the legality of the strike drafted by officials serving any one of the Defendants and shared with the National Security Council; and (3) any "record of discussions" or "summary of conclusions" related to a meeting or meeting(s) involving lawyers for any of the Defendants and pertaining to the Soleimani strike; or confirmation that no such records exist; and

- By March 18, 2020, or by another date certain to be determined by the Court, all non-exempt requested records (or acknowledgement if no such records exist).

## ARGUMENT

Protect Democracy is entitled to a preliminary injunction ordering expedited processing and production of records responsive to the FOIA requests addressed to Defendants on January 3, 2020.  In considering a request for a preliminary injunction, a court must weigh four factors:

> (1) whether the plaintiff has a substantial likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury absent injunctive relief; (3) whether an injunction would substantially injure other interested parties; and (4) whether the grant of an injunction would further the public interest.

*Al-Fayed v. CIA*, 254 F.3d 300, 303 (D.C. Cir. 2001).  Here, all four factors weigh in favor of granting Protect Democracy's motion.

## I.     Plaintiff Is Likely to Succeed on the Merits

Protect Democracy is likely to succeed on the merits because Defendant has failed to meet FOIA's unambiguous deadlines, thereby entitling Protect Democracy to relief.  The statute sets out a timeline by which agencies must determine whether they will grant a request, and it accelerates the requirements for making such determinations and actually producing documents when an agency grants expedited processing pursuant to 5 U.S.C. § 552 (a)(6)(E)(iii).  "Where, as here, the agency has not yet issued a determination and the statutory deadline has passed, it

14

has violated FOIA." *Am. Oversight v. U.S. Dep't of State*, 414 F. Supp. 3d 182, 186 (D.D.C. 2019). "FOIA specifically permits courts to 'enjoin [an] agency from withholding agency records and to order the production of any agency records improperly withheld.'" *Id.* at 184 (quoting 5 U.S.C. § 552(a)(4)(B)) (alteration in original).

Under ordinary circumstances, the government must respond to a FOIA request within twenty business days and "at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Citizens for Responsibility & Ethics in Wash. v. Fed. Election Comm'n*, 711 F.3d 180, 188 (D.C. Cir. 2013). Agencies can avail of a ten-business-day extension of this deadline upon showing "unusual circumstances." 5 U.S.C. § 552(a)(6)(B). Upon determining the scope of any production, an agency must "make the records 'promptly available,' which depending on the circumstances typically would mean within days or a few weeks of a 'determination,' not months or years." *Citizens for Responsibility & Ethics in Wash.*, 711 F.3d at 188 (quoting 5 U.S.C. § 552(a)(3)(A), (a)(6)(C)(i)). For requests entitled to expedited processing, Defendant must "process *as soon as practicable* any request for records to which the agency has granted expedited processing." 5 U.S.C. § 552(a)(6)(E)(iii) (emphasis added).

Thirty-one business days have passed since Defendants received Protect Democracy's requests, and Defendants have thus far failed to make the required determinations, let alone produce any documents. Defendants have thus missed the statutory deadline and violated FOIA. In light of that violation, Protect Democracy "is certain to succeed on the merits of its claim that State owes it a determination on its requests." *Am. Oversight*, 414 F. Supp. 3d at 186. "And

15

since disclosure of non-exempt documents must follow shortly thereafter, the Court may order

those disclosures at the same time under its customary supervisory authority in FOIA matters."

*Id.*

## II.     **Plaintiff Will Be Irreparably Harmed Absent the Requested Relief**

As the Supreme Court has observed, public awareness of the government's actions is "a

structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S.

157, 172 (2004).  Public awareness must be *timely* because "stale information is of little

value." *Payne Enters. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988).  "When 'time is

necessarily of the essence,' the harm in agency delay is more likely to be irreparable." *Am.*

*Oversight*, 414 F. Supp. 3d at 186  (granting preliminary injunction in FOIA case involving

request for documents reflecting communications between senior State Department officials and

President Trump's personal lawyer, Rudy Giuliani, and documents reflecting communications

between State Department officials and the White House regarding recall of former ambassador

to Ukraine, Marie Yovanovich, in light of related impeachment inquiry) (quoting *Elec. Privacy*

*Info. Ctr. v. U.S. Dep't of Justice*, 416 F. Supp. 2d 30, 40-41 (D.D.C. 2006) ("EPIC")).

Protect Democracy, as well as the public, will suffer irreparable injury if it does not

receive the requested information in time to inform ongoing congressional deliberations.  The

subject of the request—the President's decision to launch a military strike against Iran and, more

specifically, his legal authority and policy justification for doing so—is of the utmost national

significance, as shown by extensive news media and congressional attention.  *See, e.g.*, Tim

Lister & Eve Bower, *Growing doubts on legality of US strike that killed Iranian general*, CNN

(last updated Jan. 6, 2020), https://www.cnn.com/2020/01/06/middleeast/soleimani-strike-

legality-doubts-us-iran-intl/index.html.[38]  As discussed, the Senate has already passed a

resolution curtailing President Trump's war powers against Iran, and the House could vote on it

as soon as it is back in session on February 25—six days from the date of this filing.  The

window for public input on this legislation could close in a matter of days.

In the meantime, lack of information prevents the American people from adequately

weighing in.  Given the dearth of public written records, conflicting statements from the

administration create confusion as to policy and legal rationale for the targeted killing.  At first,

administration officials claimed that Soleimani's killing was in response to an imminent threat of

attack, after which President Trump specified that the purported threat had been to four U.S.

embassies across the Middle East.[39]  His own Defense Secretary declined to corroborate his

---

[38] For additional media coverage on questions concerning the legality of the targeted killing and related congressional deliberations, see, for example, Scott R. Anderson, *Did the President Have the Domestic Legal Authority to Kill Qassem Soleimami*, Lawfare (Jan. 3, 2020), https://www.lawfareblog.com/did-president-have-domestic-legal-authority-kill-qassem-soleimani; Ken Dilanian, *Was it legal for Donald Trump to order the killing of a top Iranian general?*, NBC News (Jan. 3, 2020), https://www.nbcnews.com/news/world/was-it-legal-donald-trump-order-killing-top-iranian-general-n1109961; Sean Illing, *An expert on why the Soleimani assassination was almost certainly illegal*, Vox (Jan. 3, 2020), https://www.vox.com/2020/1/3/21048012/iran-general-killed-qasem-soleimani-legality; Merrit Kennedy & Jackie Northam, *Was it Legal For the U.S. To Kill a Top Iranian Military Leader*, NPR (Jan. 4, 2020), https://www.npr.org/2020/01/04/793412105/was-it-legal-for-the-u-s-to-kill-a-top-iranian-military-leader; Ed Kilgore, *What Legal Authority Did Trump Have to Assassinate Qasem Soleimani?*, N.Y. Mag. (Jan. 3, 2020), http://nymag.com/intelligencer/2020/01/what-is-trumps-legal-authority-for-soleimani-assassination.html; Lisa Mascaro & Deb Riechmann, *Trump tests Congress' war powers with strike against Iran*, AP (Jan. 7, 2020), https://apnews.com/9a76c82948930cdcd2e6531b3030670d; William Roberts, *Was Trump's order to assassinate Iran's Qassem Soleimani legal?*, Al Jazeera U.S. (Jan. 3, 2020), https://www.aljazeera.com/news/2020/01/trump-order-assassinate-iran-qassem-soleimani-legal-200103212119366.html; Catie Edmondson, *In Bipartisan Bid to Restrain Trump, Senate Passes Iran War Powers Resolution*, N.Y. Times (Feb. 13, 2020), https://www.nytimes.com/2020/02/13/us/politics/iran-war-powers-trump.html; Elliot Setzer, *White House Releases Report Justifying Soleimani Strike*, Lawfare (Feb. 14, 2020), https://www.lawfareblog.com/white-house-releases-report-justifying-soleimani-strike.

[39] *See supra* at 7.

17

account, and then it was reported that he had approved Soleimani's killing seven months in advance.[40]  Afterwards, he tweeted that "it doesn't really matter" whether the targeted killing was due to an imminent threat of attack, and that Soleimani's "horrible past" alone justified the use of military force against him,[41] thereby disavowing any domestic and international legal constraints on his war powers.  After the Senate then voted to restrict his power to use military force against Iran, his administration pivoted again.  Six weeks after the strike, the Trump administration claimed *for the first time* in public that the strike was somehow covered by Congress's 2002 grant of authority to wage war on Iraq.[42]

Public input is never more vital than in deciding whether to send our troops and treasure into battle.  Hence, the Framers of the Constitution placed the power to declare war in the hands of the most representative branch of government.  As then-Congressman Abraham Lincoln explained, "Kings had always been involving and impoverishing their people in wars, pretending generally, if not always, that the good of the people was the object," so the Framers "resolved to so frame the Constitution that no one man should hold the power of bringing this oppression upon us."[43]

Protect Democracy, and more importantly, the American people, will be irreparably harmed if the public is denied the information relevant to the congressional debate regarding President Trump's Iran war powers.  "[T]ime is necessarily of the essence," *Am. Oversight*, 414

---

[40] *See supra* at 7.
[41] *See supra* at 7-8.
[42] *See supra* at 8.
[43] Abraham Lincoln to William H. Herndon, 15 Feb. 1848, *Collected Works of Abraham Lincoln*, vol. 1, http://quod.lib.umich.edu/l/lincoln/lincoln1/1:458.1?rgn=div2;view=fulltext (accessed Jan. 21, 2020).

F. Supp. 3d at 186, because the window for public input on crucial legislation to constrain further

hostilities with Iran could close in a matter of days.

### III.    The Requested Relief Will Not Burden Others' Interests

The preliminary injunction sought here would not burden others' interests.  Defendant

cannot be "burdened" by a requirement that it merely comply with the law.  *See Jacksonville*

*Port Auth. v. Adams,* 556 F.2d 52, 59 (D.C. Cir. 1977) (recognizing "an overriding public

interest . . . in the general importance of an agency's faithful adherence to its statutory

mandate").  To the extent that there is a burden to others awaiting processing of FOIA requests,

it is one imposed by Congress, which is the proper place for concerns to be addressed.  *See Elec.*

*Frontier Found. v. Off. of Director of Nat'l Intelligence*, No. C 07-5278 SI, 2007 WL 4208311,

at *7 (N.D. Cal. Nov. 7, 2007) (citing *Fiduccia v. U.S. Dep't of Justice*, 185 F.3d 1035, 1041

(9th Cir. 1999)) ("any complaints about the burdens of complying with the law are best

addressed to Congress, not the courts.").  Furthermore, in practical terms, it would be difficult for

Defendants to argue that injunctive relief in this case would cause much delay to other requesters

given the very specific nature of Plaintiff's FOIA requests and extremely limited time window

("December 1, 2019 through the present").  And even granting that argument, "[t]his is the

extraordinary case where the public interest favors placing [Protect Democracy's] requests ahead

of other requests in [Defendants'] FOIA queues."  *Am. Oversight*, 414 F. Supp. 3d at 187; *see*

*also Ctr. for Pub. Integrity v. United States Dep't of Def.*, 411 F. Supp. 3d 5, 14-15 (D.D.C.

2019) (granting preliminary injunction in FOIA case requesting documents from DOD and OMB

concerning the withholding of military aid to Ukraine, concluding "that the extraordinary

circumstances presented in this case warrant [FOIA queue] line-cutting").  It is truly the

exceptional case where the President launches a unilateral attack, without consultation or

apparent authorization, on the top military figure of a hostile regional power, potentially "setting off a . . . massive regional war."[44]

## IV.     The Public Interest Favors the Requested Relief

The final factor in the preliminary injunction analysis also weighs in favor of issuance of the order Protect Democracy seeks in this case.  Release of FOIA records promotes the public interest by "'shed[ding] light on an agency's performance of its statutory duties." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989).  But more fundamentally, courts have long recognized a presumptive public interest in "an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth.*, 556 F.2d at 59.  Lastly, the "timely release" of information given media attention and congressional action makes the public interest "particularly well-served." *EPIC*, 416 F. Supp. 2d at 42.

Protect Democracy's interest is not only in Defendants' general adherence to their statutory mandates.  In this particular case, disclosure of the requested records will serve the public interest by allowing a meaningful public debate on the President's decision and legal authority to initiate military conflict.  Legislation on this very issue has already passed the Senate, and likely will pass the House in a matter of weeks—if not days.  The public has a vital interest in assessing the requested information in time for that assessment to inform its representatives' decisionmaking.

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a preliminary injunction should be granted.

---

[44] Christopher S. Murphy (@ChrisMurphyCT), Twitter (Jan. 2, 2020, 5:49 PM), https://twitter.com/ChrisMurphyCT/status/1212913952436445185.

Dated: February 19, 2020

Respectfully submitted,

THE PROTECT DEMOCRACY PROJECT, INC.

By: */s/  Anne H. Tindall*
    Anne H. Tindall
    The Protect Democracy Project, Inc.
    2020 Pennsylvania Ave., NW, #163
    Washington, DC 20006
    T: (202) 579-4582 | F: (929) 777-8428
    anne.tindall@protectdemocracy.org

    Benjamin L. Berwick
    The Protect Democracy Project, Inc.
    15 Main Street, Suite 312
    Watertown, MA 02472
    T: (202) 579-4582 | F: (929) 777-8428
    ben.berwick@protectdemocracy.org

    John Paredes*
    The Protect Democracy Project, Inc.
    115 Broadway, 5th Floor
    New York, NY 10006
    T: (202) 579-4582 | F: (929) 777-8428
    john.paredes@protectdemocracy.org

    *Counsel for Plaintiff*

    *Motion for admission *pro hac vice* pending.