**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| PROTECT DEMOCRACY PROJECT, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 20-172 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 31, 34 |
| | : | | |
| U.S. DEPARTMENT OF JUSTICE *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

# MEMORANDUM OPINION

## DEFERRING JUDGMENT ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

The Protect Democracy Project, a watchdog organization, seeks a memorandum describing legal advice that government lawyers gave the President's advisors about an airstrike against an Iranian general. To that end, the Project filed this Freedom of Information Act ("FOIA") lawsuit against the Department of Justice, the Department of Defense, and the Department of State (collectively, "the Government"). The Government refuses to give up the memo. It claims that the memo's contents are privileged. Without reviewing the memo, the Court cannot say whether that is the case. Accordingly, it will defer ruling on the parties' opposing summary judgment motions until it can review the memo *in camera*.

## II. BACKGROUND

At the beginning of 2020, the United States conducted a drone strike in Iraq that killed Iranian General Qassem Soleimani. Pl.'s Statement of Undisputed Facts ("Pl.'s Statement") ¶ 6, ECF No. 34-4. Soleimani was the head of Iran's Quds Force, a component of the Revolutionary

Guard responsible for foreign intelligence and paramilitary operations. Pl.'s Mot., Ex. C at 1. In that capacity, he reportedly engineered the deaths of hundreds of Americans in Iraq. *Id.*

The Administration sent mixed messages following the strike. President Trump and Secretary of State Mike Pompeo told reporters that Soleimani posed an imminent threat—likely to American embassies—and thus needed to be stopped. Pl.'s Statement ¶¶ 15, 20, 24–26, 30. But Secretary of Defense Mark Esper said that he had seen no evidence of a planned attack on U.S. embassies. *Id.* ¶ 27. And Attorney General William Barr described the "concept of imminence" as "something of a red herring." *Id.* ¶ 32. In addition, it turned out that President Trump had authorized the strike against Soleimani seven months earlier. *Id.* ¶ 29.

Nearly a month after the strike, the President sent a notice to Congress informing it of "a change in application of the existing legal and policy frameworks" governing the use of military force. Pl.'s Mot., Ex. V ("NDAA Notice") at 1, ECF No. 34-27; *see also* Pl.'s Mot., Ex. U ("NDAA Notice Letter"), ECF No. 34-26. The one-and-a-half-page notice said that the strike responded to an "escalating series of attacks in preceding months by Iran and Iran-backed militias on United States forces and interests in the Middle East region." NDAA Notice at 1. It explained that the strike was intended "to protect United States personnel, to deter Iran from conducting further attacks . . . , to degrade Iran's and Qods Force-backed militias' ability to conduct attacks, and to end Iran's strategic escalation of attacks on, and threats to United States interests." *Id.* Ultimately, the notice justified the strike under international law as self-defense and under domestic law as permitted by Article II and the 2002 Authorization for Use of Military Force Against Iraq ("2002 AUMF"). *Id.* at 1–2.

Over a month later, Defense Department General Counsel Paul Ney gave a speech on the strike at Brigham Young University Law School. The "aim" of the speech, Ney said, was "to

explain the international and domestic law underpinnings" of the strike. *See* Pl.'s Mot., Ex. X ("BYU Speech") at 1, ECF No. 34-29. He provided factual background on Soleimani and U.S. involvement in Iraq, *id.* at 2–4, described how the strike was legal under international law, *id.* at 4–6, and then outlined the legal bases for the strike under domestic constitutional and statutory law, *id.* at 6–8. Ney echoed the same "Bottom Line" as the President's notice to Congress: he asserted that the strike was self-defense under international law and grounded domestic authority for carrying it out in Article II and the 2002 AUMF. *Id.* at 1–2. The Department of Defense posted the speech on its website. *See generally id.*

Apparently displeased with the Administration's decision to act unilaterally against Soleimani, Congress passed a joint resolution purporting to prohibit further military action against Iranian forces without congressional approval. *See* Pl.'s Mot., Addendum A. It said, among other things, that no statute gave the President power to use military force against Iran. *Id.* President Trump vetoed the resolution. In an accompanying statement, he specifically rejected Congress's assertion that the strike lacked statutory authorization. *See* Pl.'s Mot., Ex. Y ("Veto Statement") at 2, ECF 34-30. He reiterated that he had the power to call for the strike under Article II and the 2002 AUMF. *See id.* at 2–3.

This litigation has its origins in the day after the strike. That day, the Project submitted a FOIA request to the Department of Justice, the Department of Defense, and the Department of State asking for a variety of records relating to the strike. Defs.' Statement of Material Facts ("Defs.' Statement") ¶ 1, ECF No. 38. After bringing suit against the agencies in an effort to compel disclosure, the Project eventually agreed to narrow its request to a single document: a memorandum written by attorneys at the Office of Legal Counsel in the Department of Justice (the "OLC Memo"). *See id.* ¶ 10. According to a member of that office ("OLC"), the document

memorializes legal advice given to the President's national security advisors prior to the strike. Colborn Decl. ¶ 15, ECF No. 31-1. The Government argues it does not have to disclose the memo. *See* Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mot."), ECF No. 31. Both sides now move for summary judgment. *See id.*; Pl.'s Mem. Supp. Mot. Summ. J. and Opp'n Defs.' Mot. Summ. J. ("Pl.'s Mot."), ECF No. 34-1.

## III. LEGAL STANDARD

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). It "thus mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). Those exemptions reflect Congress's recognition that "public disclosure is not always in the public interest." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 618 (D.C. Cir. 2011) (quoting *CIA v. Sims*, 471 U.S. 159, 167 (1985)). But because "disclosure, not secrecy, is the dominant objective of the Act," the exemptions "must be narrowly construed." *Rose*, 425 U.S. at 361. For the same reason, the Government "bears the burden of showing that a claimed exemption applies." *See Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014).

A court must grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Given that FOIA disputes usually involve the application of law to undisputed facts, they are "typically and appropriately" resolved on such motions. *See Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009); *see also Judicial Watch, Inc. v. U.S. Dep't of Def.*, 245 F. Supp. 3d 19, 26 (D.D.C. 2017). The Government can earn

summary judgment only if it presents affidavits that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Elec. Frontier Found.*, 739 F.3d at 7 (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

## IV. ANALYSIS

To avoid disclosing the OLC Memo, the Government invokes only one exemption: Exemption 5. Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552. It "simply incorporates civil discovery privileges" that the agency could assert in ordinary litigation. *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984); *see also Taxation With Representation Fund v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981). Applicable here, the Government argues, are the presidential communications, attorney-client, and deliberative process privileges. Defs.' Mot. at 5.

There is little doubt that at least the presidential communications privilege covers the OLC Memo. That privilege protects "communications made by presidential advisers in the course of preparing advice for the President," including those "which . . . advisers solicited and received from others." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997). It "covers documents reflecting 'presidential decisionmaking and deliberations,' regardless of whether the documents are predecisional or not, and it covers the documents in their entirety." *Loving v. Dep't of Def.*, 550 F.3d 32, 37–38 (D.C. Cir. 2008) (quoting *In re Sealed Case*, 121 F.3d at 744).

The OLC Memo fits that bill. John Eisenberg, Deputy Counsel to the President and Legal Adviser to the National Security Council, asked OLC to prepare the memo to memorialize advice the office had given the President and other senior officials prior to the strike. Colborn Decl. ¶ 15. That kind of advice is exactly the sort of communication the privilege is meant to shield. *See, e.g.*, *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F. Supp. 3d 162, 173 (D.D.C. 2018) ("[I]f the [National Security Council] Legal Adviser were to solicit a document related to a national security decision being contemplated by the President, it would no doubt be protected by the presidential communications privilege."); *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 245 F. Supp. 3d 19, 28 (D.D.C. 2017) (holding that privilege applied to memoranda memorializing advice that CIA, Department of Defense, and National Security Council lawyers gave the President and his national security team before the raid on Osama bin Laden's compound).

The Project does not disagree. Rather than dispute the appropriateness of any privilege individually, it counters that the OLC Memo should be made public either because it represents the Government's "working law" or because the Government waived its privileges. *See* Pl.'s Mot. at 12. The Court rejects the first argument, but it needs to review the OLC Memo before it can rule on the second. Consequently, the Court orders the Government to submit the memo for *in camera* inspection.

**A. The OLC Memo Does Not Represent the Executive Branch's Working Law**

FOIA requires agencies to disclose their "working law." *Elec. Frontier Found.*, 739 F.3d at 7 (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 152–53 (1975)). Working law consists of "'binding agency opinions and interpretations' that the agency 'actually applies in cases before it.'" *Id.* (quoting *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983)). It

includes "the reasons which did supply the basis for an agency policy actually adopted . . . . if expressed within the agency." *Sears*, 421 U.S. at 152–53; *accord Ball v. Bd. of Governors of Fed. Rsrv. Sys.*, 87 F. Supp. 3d 33, 48 (D.D.C. 2015). The purpose of the working law doctrine is to prevent an agency from "develop[ing] a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final.'" *Elec. Frontier Found.*, 739 F.3d at 7 (internal quotation marks omitted) (quoting *Schlefer*, 702 F.2d at 244).

Usually, working law cases deal with an agency document that sets forth that agency's general policy or applies the policy to particular circumstances. *See id.* at 9; *see also id.* at 7–8 (summarizing cases). This case is different. OLC cannot speak for the President and his national security advisors, so its memo "amounts to advice offered . . . for [their] consideration." *Id.* at 8. (discussing OLC Opinion written to advise FBI officials). Documents of that nature—those which "concern the *advisability* of a particular policy, but do not authoritatively state or determine the agency's policy"—are "not the law of an agency unless the agency adopts it." *Id.* The Project recognizes as much. *See* Pls.' Reply Supp. Mot. Summ. J. ("Pls.' Reply") at 3, ECF No. 41. The working law question thus comes down to whether the Government adopted the OLC Memo to justify the strike against Soleimani.

An agency forfeits its claim to Exemption 5's protections if it "'chooses *expressly* to adopt or incorporate by reference' a memorandum that would have otherwise been protected by . . . privilege." *Elec. Frontier Found.*, 739 F.3d at 10 (quoting *Sears*, 421 U.S. at 161). Critically, a "casual allusion in a post-decisional document," *Common Cause v. IRS*, 646 F.2d 656, 660 (D.C. Cir. 1981), or an agency official's mere "reference to a report's conclusions," *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1197 (D.C. Cir. 1991), is not enough.

Adoption requires not just agreement with a document's conclusions but the agency's ratification of the document's reasoning. *See Elec. Frontier Found.*, 739 F.3d at 10 ("[I]t must be evident that 'the reasoning in the report is adopted by the [agency] as its reasoning, even when [the agency's decision] agrees with the conclusion of a report.'" (alterations in original) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975))).

The Project says that the Executive Branch signaled its adoption of the OLC Memo on three occasions: when the President sent his notice of the strike to Congress, when Defense Department General Counsel Ney gave his speech at BYU Law School, and when the President vetoed Congress's joint resolution prohibiting further military action against Iran. *See* Pl.'s Mot. at 12–14. Neither the notice nor the veto statement acknowledges the OLC Memo at all. *See* NDAA Notice; Veto Statement. And "[m]uch" of the rationale Ney related in his speech was "reflected in publicly available documents." BYU Speech at 1. But Ney did reference OLC documents at one point. He explained that the Constitution did not require congressional preapproval for the strike because it did not rise to the level of "war" as defined by "[t]he relevant Department of Justice OLC opinions." *Id.* at 6. After sketching out that definition in one paragraph, he applied it to the Soleimani case in another. *Id.* at 6–7.

None of these statements constituted public adoption of the OLC Memo. Two of the three did not even mention the memo, much less "expressly . . . adopt or incorporate [it] by reference." *See Sears*, 421 U.S. at 161. And Ney did little more in his speech. He did not single out the OLC Memo specifically or state that it embodied Executive Branch policy. At best, his nonspecific mention of "[t]he relevant . . . OLC opinions" was just the sort of "casual allusion" or "reference" that the D.C. Circuit has repeatedly warned falls short of adoption. *See Common Cause*, 646 F.2d at 660 (rejecting adoption when a post-decisional memo made merely a "casual

allusion" to "reasons discussed" in the requested, pre-decisional documents); *Access Reports*, 926 F.2d at 1197 (explaining that, even if "one might read the confused statement" of an agency official "as a reference" to results contained in the requested document, it "fell far short of the *express* adoption required").[1] On top of that, even had Ney said more on the OLC Memo, it is questionable whether he had the authority to adopt it on behalf of the Executive Branch. *See Ball*, 87 F. Supp. 3d at 52 ("[I]t is not clear whether [the General Counsel of the Federal Reserve Board] had the authority to adopt Board policy in the first place.")

The Project nevertheless argues that the three statements indicate the Executive Branch has adopted the OLC Memo internally.[2] It says that similarities between the statements point toward a common source of policy. *See* Pl.'s Mot. at 12–14. Most conspicuously, the three statements contain some language that is nearly identical. Each includes a sentence like this one found in the notice:

---

[1] As the Court will discuss, however, whether Ney's speech disclosed parts of the OLC Memo and therefore waived the Government's ability to withhold those parts is another question.

[2] The Government suggests that an agency's adoption must be public. *See* Defs.' Reply Supp. Mot. Summ. J. and Opp'n Pl.'s Cross-Mot. Summ. J. at 4–5, ECF No. 39. But that rule would be at odds with the purpose of the working law doctrine. Whether an agency ratified a policy publicly or privately, the policy would still amount to "secret law" if it was the agency's position and the agency did not disclose it. *See Elec. Frontier Found.*, 739 F.3d at 7 (citation omitted). Indeed, the D.C. Circuit has repeatedly required disclosure of working law that an agency developed privately. *See id.* at 7–8 (describing cases).

The Government's contrary position reads too much into a sentence from *Electronic Frontier Foundation* meant only to distinguish cases cited by the plaintiff in that case: "But these cases are inapposite because, in each one, the agency *itself* publicly invoked the reasoning of the OLC memorandum *to justify* its new position." *Id.* at 11. That distinction defined the boundaries of public adoption. It made clear that the agency defendant there did not publicly adopt an OLC opinion when the agency's inspector general referred to it in a report or when an agency official mentioned the opinion merely in response to legislators' questions about it. *See id.* at 11–12. *Electronic Frontier Foundation* did not hold that public adoption was the only way an agency could adopt a policy. As the Project cogently explains, public invocation can be sufficient to adopt a policy, but it is not necessary. Pl.'s Reply at 4.

> Although the threat posed by Saddam Hussein's regime was the initial focus of the statute, the United States has long relied upon the 2002 AUMF to authorize the use of force for the purpose of establishing a stable, democratic Iraq and addressing terrorist threats emanating from Iraq.

NDAA Notice at 1.[3] And both the notice and the speech include another similar sentence declaring that the strike was consistent with "longstanding interpretation of the President's authority."[4] The Project also asserts that the "shift" in Administration officials' justifications for the strike—from contradictory accounts about heading off an imminent attack to more uniform statements about generally protecting U.S. interests in Iraq—"coincided with the finalization and release of the OLC Memo." Pl.'s Reply at 5; *see also* Pl.'s Mot. at 5–10. According to the Project, the fact that officials made "matching public statements . . . only after the OLC issued its Memo demonstrate that the Executive Branch likely adopted the OLC Memo as its primary—perhaps singular—expression of working law on the targeted killing of Iranian government officials." Pl.'s Mot. at 13.

The Court cannot agree. Most importantly, the shared language the Project highlights offers little in the way of reasoning. The similar sentences found in each statement merely repeat the conclusion that the strike against Soleimani was consistent with prevailing interpretations of the 2002 AUMF. Those excerpts do not engage with the text of the AUMF, analogize to specific

---

[3] *See also* BYU Speech at 7 ("[A]lthough the threat posed by Saddam Hussein's regime was the initial focus of the 2002 AUMF, the United States has relied consistently upon the 2002 AUMF to authorize the use of force for the purpose of establishing a stable, democratic Iraq and addressing terrorist threats emanating from Iraq . . . .");Veto Statement at 2 ("The United States has long relied upon the 2002 AUMF to authorize the use of force for the purpose of establishing a stable, democratic Iraq and for addressing terrorist threats emanating from Iraq.").

[4] *See* NDAA Notice at 2 ("The airstrike against Soleimani in Iraq is consistent with this longstanding interpretation of the President's authority under Article II and the 2002 AUMF."); BYU Speech at 8 ("The air strike against Soleimani in Iraq is consistent with this longstanding interpretation of the President's authority under the 2002 AUMF.").

instances of historical practice, or grapple with counterarguments. Instead, the statements share only a "generic explanation" of the President's statutory authority. *Cf. Ball*, 87 F. Supp. 3d at 51 (holding that an agency did not adopt deliberative documents when press release, testimony, and a congressional report "merely recount[ed] the general factual background and reasons for [an agency's] decisions"). To infer a common source of reasoning from the fact that the statements share that high-level conclusion—or any others—would create a backdoor around precedent "refus[ing] to equate reference to a report's conclusions with adoption of its reasoning." *See Elec. Frontier Found.*, 739 F.3d at 10 (quoting *Access Reports*, 926 F.2d at 1197); *see also Renegotiation Bd.*, 421 U.S. 168, 184 (1975) (finding that documents fell within Exemption 5 in part because "the evidence utterly fail[ed] to support the conclusion that the reasoning in the reports w[as] adopted by the [agency] as its reasoning, even when it agree[d] with the conclusion"). And because the similar excerpts the Project focuses on do not even mention the OLC Memo, it is speculative to attribute them to the memo anyway. Indeed, contrary to the Project's telling of events, OLC did not finalize its memo until after the President sent his notice to Congress. *Compare* Notice of OLC Memorandum, ECF No. 25 (explaining that the OLC Memo "was signed after January 31, 2020"), *with* NDAA Notice Letter (listing the transmittal date of the notice as January 31, 2020).

While an agency bears the burden of demonstrating that a FOIA exemption applies, the requester bears the burden of establishing that the agency adopted a document as working law. *See Ball*, 87 F. Supp. 3d at 52; *Sec. Fin. Life Ins. Co. v. Dep't of Treasury*, No. 03-cv-102, 2005 WL 839543, at *6–7 (D.D.C. Apr. 12, 2005); *see also Renegotiation Bd.*, 421 U.S. at 184 (ruling for agency when there was no evidence that it adopted reports' reasoning). The Project has not met that burden. Given that only Ney's speech even mentions an OLC opinion and that the three

statements do not share much in common beyond high-level legal conclusions, it is far from "evident" that the Executive Branch has adopted the memo's reasoning as its own. *See Elec. Frontier Found.*, 739 F.3d at 10.

### B. The Court Must Review the OLC Memo *In Camera* to Determine Whether the Government Waived Its Claim to Exemption 5

An agency's disclosure of information to the public or third parties can waive its claim to a FOIA exemption. *See Davis v. U.S. Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992); *Mobil Oil Corp. v. U.S. EPA*, 879 F.2d 698, 700 (9th Cir. 1989). Importantly, however, waiver by disclosure is limited to the information actually disclosed. *See In re Sealed Case*, 121 F.3d at 741 ("[R]elease of a document only waives [executive] privileges for the document or information specifically released, and not for related materials."); *see also Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 605 (D.C. Cir. 2001) (denying Exemption 5 waiver in part because "quoting portions of some attachments" was not "inconsistent with a desire to keep the rest secret"). A broader rule might discourage agencies from voluntarily disclosing information "out of the fear that by doing so they are exposing other, more sensitive" information. *See In re Sealed Case*, 121 F.3d at 741. Because expecting an agency to prove that it has not somehow disclosed the requested information "might require [it] to undertake an exhaustive, potentially limitless search," the plaintiff asserting prior disclosure "bear[s] the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Davis*, 968 F.2d at 1279 (quoting *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983)); *see also Protect Democracy Project*, 320 F. Supp. 3d at 169; *Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 197 (D.D.C. 2013).

The Project says that each of the three public statements on the strike against Soleimani "publicly disclosed the subject of the OLC Memo," but it concentrates its waiver argument on

Defense Department General Counsel Ney's speech at BYU Law School. *See* Pl.'s Mot. at 15. For assessing whether Ney waived a portion of the OLC Memo by disclosing it, the most significant part of the speech is his discussion of the constitutional authority for the strike. When explaining why the President did not need congressional preapproval for the strike, he said:

> So what does a "war" in the constitutional sense mean? The relevant Department of Justice OLC opinions say that we must engage in a "fact-specific assessment of the 'anticipated nature, scope, and duration' of the planned military operations." Under this standard, military operations may rise to the level of "war" in the constitutional sense when the actions are likely to lead to "prolonged and substantial military engagements, typically involving exposure of U.S. military personnel to significant risk over a substantial period." Some of the most relevant facts in this analysis would include the numbers of additional forces to be deployed, the quantity of munitions expended, estimates regarding U.S. and enemy casualties, and whether ground forces are to be deployed into a war zone. Making an assessment of the anticipated nature, scope, and duration of planned military operations is one of those judgments that are, as Justice Jackson described, "delicate, complex, and involve large elements of prophecy," which have traditionally been committed to the Executive branch, given its military, diplomatic, and intelligence resources.

BYU Speech at 6–7. He went on to apply that standard to Soleimani's case:

> The strike against Soleimani did not involve a substantial military engagement, the deployment of additional U.S. forces, or the risk of significant casualties. The operation was circumscribed: it consisted of one targeted air strike in Iraq, executed by an unmanned aerial vehicle, designed to avoid civilian casualties or substantial collateral damage, and intended to prevent future attacks against U.S. persons and interests in Iraq and throughout the region. It was not "aim[ed] at the conquest or occupation of territory nor . . . at imposing through military means a change in the character of a political régime."

*Id.* at 7 (alteration and omission in original). The Project argues that these passages indicate that the speech "very likely" disclosed the OLC Memo's conclusions and reasoning. *See* Pl.'s Mot. at 16; *see also* Pl.'s Reply at 7.

That may be right—at least, to some extent. Ney certainly quoted from *some* OLC document (or documents) in his speech. But whether he divulged the conclusions and reasoning of the memo dealing specifically with the strike against Soleimani is a different question. On the one hand, the three unattributed quotations that followed his reference to "[t]he relevant Department of Justice OLC opinions" defined "war" in terms that previously published OLC opinions treat as standard language.[5] The quotations thus reveal little about the OLC Memo's reasoning. On the other hand, Ney applied that general definition of "war" to the facts of the Soleimani strike. And in the context of a speech devoted to explaining the Soleimani strike, the most obvious OLC opinion for Ney to draw on would have been the one written for the same purpose. As a result, it may well be that the speech divulged some of the analysis contained in the OLC Memo.

Remember, however, that waiver applies only to the specific information previously disclosed. *See In re Sealed Case*, 121 F.3d at 741.[6] In other words, the Court could order the

---

[5] *See, e.g.*, *April 2018 Airstrikes Against Syrian Chemical-Weapons Facilities*, 42 Op. O.L.C. __, at *18 (2018), https://www.justice.gov/olc/opinion/file/1067551/download (stating that whether military operations amount to war "requires a fact-specific assessment of the 'anticipated nature, scope, and duration' of the planned military operations." (citation omitted)); *Targeted Airstrikes Against the Islamic State of Iraq and the Levant*, 38 Op. O.L.C. 82, 119 (2014), https://www.justice.gov/olc/file/1375346/download ("Military actions generally rise to the level of 'war' for constitutional purposes only when they involve 'prolonged and substantial military engagements, typically involving exposure of U.S. military personnel to significant risk over a substantial period.'" (citation omitted)); *Proposed Deployment of United States Armed Forces into Bosnia*, 19 Op. O.L.C. 327, 332 (1995), https://www.justice.gov/file/20146/download ("The operation does not aim at the conquest or occupation of territory nor even, as did the planned Haitian intervention, at imposing through military means a change in the character of a political régime.").

[6] Many courts in this district apply the official acknowledgment test to determine whether a previous disclosure demands the release of requested information notwithstanding an applicable FOIA exemption. *See, e.g.*, *Protect Democracy Project*, 320 F. Supp. 3d at 171–72, 177–78 (applying test in the Exemption 5 context); *ACLU v. CIA*, 109 F. Supp. 3d 220, 239, 243 (D.D.C. 2015) (same), *aff'd* 640 F. App'x 9 (D.C. Cir. 2016); *Nat'l Sec. Counselors*, 960 F. Supp. 2d at 197–199 (same). That test, which originated in Exemption 1 and Exemption 3 cases,

release of just those portions of the OLC Memo that are already public. *See Protect Democracy Project*, 320 F. Supp. 3d at 177–78 (ordering the release of "the portions of the [requested] documents that contain" a paragraph "replicated" in an official's "on-the-record statement"); *Nat'l Sec. Counselors*, 960 F. Supp. 2d at 198 (requiring the release of "those portions of" the requested document disclosed in publicly available meeting minutes); *id.* at 199 (directing the government to release "the specific portion or portions" of the requested document that provided an opinion later referred to in a publicly available OLC opinion); *see also In re Sealed Case*, 121 F.3d at 741–42 (explaining that a document's disclosure waived privileges for the body of document but not handwritten notations on the requested copy of the document). That said, it may also be that the memo is so much more detailed than the speech that the Court cannot fairly conclude that the speech disclosed the memo at all. *See Buzzfeed, Inc. v. FBI*, No. 18-cv-2567, 2020 WL 2219246, at *11 (D.D.C. May 7, 2020) (rejecting plaintiffs' claim of Exemption 5 waiver in part because a one-and-a-half-page summary was not "as specific as" the 527-page underlying document); *Protect Democracy Project*, 320 F. Supp. 3d at 171–72 (denying assertion of waiver because public statements did not provide "a legal rationale particularized enough that one could expect it to duplicate the analysis of a seven-page interagency memorandum").

---

requires that: "(1) the information requested must be as specific as the information previously released; (2) the information requested must match the information previously disclosed; and (3) the information requested must already have been made public through an official and documented disclosure." *ACLU v. U.S. Dep't of Def.*, 628 F.3d at 620–21. Whether framed in official acknowledgment or waiver terms, however, the prior disclosure must still reveal the same information the plaintiff requests to overcome an exemption. *See Protect Democracy Project*, 320 F. Supp. 3d at 171 n.3 (describing the official acknowledgment and waiver analyses as "basically duplicative," "at least in this case").

As things stand, the Court lacks the information it needs to determine the extent to which Ney's speech disclosed the OLC Memo's contents, if at all. The Court has not reviewed the memo. And the Government has not provided a detailed enough declaration to help the Court make that determination. Its declaration provides only a one-paragraph summary of the memo's contents, *see* Colborn Decl. ¶ 15, before a brief passage on waiver that does not even mention the speech. The declarant merely says: "To my knowledge, the document has not been previously disclosed publicly. In addition, I am not aware of any public statements by government officials that could constitute waiver of the privileges applicable to the document." *Id.* ¶ 23.

Because the Government declaration is "insufficiently detailed to permit meaningful review," there is only one document at issue, and the waiver question "turns on the contents" of the OLC Memo, the Court will order the Government to submit the memo for *in camera* inspection. *See Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998) (quoting *Quinon v. FBI*, 86 F.3d 1222, 1228 (D.C. Cir. 1996)); *see also ACLU v. U.S. Dep't of Def.*, 628 F.3d at 626 ("Congress intended to . . . leave the decision of whether to conduct *in camera* inspection to the broad discretion of the trial judge." (citation omitted)). *Contrast Protect Democracy Project*, 320 F. Supp. 3d at 172 (denying waiver claim and *in camera* review because a government declarant "state[d] plainly" that the public document did not "quote[] from, describe[], disclose[], or even refer[] to" the requested document); *ACLU v. CIA*, 109 F. Supp. 3d 220, 243 (D.D.C. 2015) (declining to review requested legal memoranda *in camera* when the agency declaration's "detailed descriptions" of the documents made clear that the plaintiff could not show prior disclosure), *aff'd* 640 F. App'x 9 (D.C. Cir. 2016). The Government shall submit the OLC Memo for *in camera* inspection within seven days of the issuance of this opinion and its accompanying order. In the meantime, the Court will defer ruling on the parties' cross-motions

for summary judgment. Another order will follow once the Court has had a chance to review the memo.

## V. CONCLUSION

For the foregoing reasons, the Court **DEFERS** ruling on Defendants' motion for summary judgment (ECF No. 31) and Plaintiff's motion for summary judgment (ECF No. 34). An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 26, 2021

RUDOLPH CONTRERAS
United States District Judge